## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION,
*Defendant-Appellant*,

*v.*

EDWARD O'BANNON, OSCAR ROBERTSON, WILLIAM RUSSELL,
HARRY FLOURNOY, THAD JARACZ, DAVID LATTIN, BOB TALLENT,
ALEX GILBERT, ERIC RILEY, PATRICK MAYNOR, TYRONE PROTHRO,
SAM JACOBSON, DAMIEN RHODES, DANNY WIMPRINE, RAY ELLIS,
JAKE FISCHER, JAKE SMITH, DARIUS ROBINSON, MOSES ALIPATE, and
CHASE GARNHAM,
on behalf of themselves and all others similarly situated,
*Plaintiffs-Appellees*

From Orders Denying Summary Judgment and Granting a Permanent Injunction
Entered by the United States District Court for the Northern District of California

The Honorable Claudia Wilken, Senior Judge
Case Nos. 09-cv-1967 CW & 09-cv-3329 CW

## PLAINTIFFS-APPELLEES' PETITION FOR REHEARING EN BANC

Michael P. Lehmann
Bonny Sweeney
Bruce Wecker
HAUSFELD LLP
600 Montgomery Street
Suite 3200
San Francisco, CA 94111
Tel: (415) 633-1908

Michael D. Hausfeld
Hilary K. Scherrer
Sathya S. Gosselin
Swathi Bojedla
HAUSFELD LLP
1700 K St. NW, Ste. 650
Washington, DC 20006
Tel: (202) 540-7200

Jonathan Massey
MASSEY & GAIL LLP
1325 G St. NW
Suite 500
Washington, DC 20005
Tel: (202) 652-4511

*Counsel for Plaintiffs-Appellees*

# **TABLE OF CONTENTS**

INTRODUCTION ..................................................................................1

BACKGROUND .................................................................................5

ARGUMENT ....................................................................................10

    I.    THE MAJORITY'S WHOLESALE RE-EVALUATION
        OF TRIAL EVIDENCE BREAKS WITH CIRCUIT
        AND SUPREME COURT PRECEDENT ........................................10

    II.    THE MAJORITY'S RE-FORMULATION OF THE LESS-
        RESTRICTIVE-ALTERNATIVE INQUIRY IS
        TAUTOLOGICAL AND AT WAR WITH DECISIONS OF
        THE SUPREME COURT AND THIS COURT. ...............................13

    III.    THE MAJORITY'S REQUIREMENT THAT A RESTRAINT
        MUST BE "*PATENTLY AND INEXPLICABLY* STRICTER
        THAN IS NECESSARY" TO INCUR LIABILITY UPENDS
        CIRCUIT PRECEDENT AND NULLIFIES THE RULE OF
        REASON .........................................................................15

    IV.    *BOARD OF REGENTS* CANNOT GOVERN THE OUTCOME
        OF THE RULE OF REASON ANALYSIS .....................................16

CONCLUSION ..................................................................................18

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Anderson v. City of Bessemer City N.C.*,
470 U.S. 564 (1985).................................................................2, 12

*Bhan v. NME Hospitals, Inc.*,
929 F.2d 1404 (9th Cir. 1991) ...........................................................15

*Hairston v. Pacific 10 Conference*,
101 F.3d 1315 (9th Cir. 1996) .......................................................4, 15

*Lentini v. Cal. Ctr. for the Arts, Escondido*,
370 F.3d 837 (9th Cir. 2004) ............................................................11

*McCormack v. NCAA*,
845 F.2d 1338 (5th Cir. 1988) ..........................................................17

*Nat'l Soc. of Prof'l Engineers v. United States*,
435 U.S. 679 (1978)...................................................................14, 15

*NCAA v. Board of Regents of the University of Oklahoma*,
468 U.S. 85 (1984).................................................................*passim*

*Smith v. NCAA*,
139 F.3d 180 (3d Cir. 1998) .............................................................17

*County of Tuolumne v. Sonora Community Hospital*,
236 F.3d 1148 (9th Cir. 2001) ......................................................4, 17

*Tanaka v. University of Southern California*,
252 F.3d 1059 (9th Cir. 2001) ..............................................4, 15, 17

*United States v. Lummi Indian Tribe*,
841 F.2d 317 (9th Cir. 1988) .......................................................2, 12

**Statutes:**

15 U.S.C. § 1 ...................................................................................6

**Other Authorities:**

Federal Rule of Appellate Procedure 35(a) ................................................................2

# INTRODUCTION

Two weeks ago, this Court affirmed the NCAA's antitrust liability for fixing the price that college athletes pay for their education. But a divided panel also extinguished the possibility of modest revenue-sharing with college athletes— despite the District Court's detailed finding, after five years of litigation and a three-week bench trial, that voluntary payments of up to $5,000 (held in trust) "*would not harm consumer demand for the NCAA's product*" and are a less restrictive alternative to the restraint. ER53 (emphasis added). That finding was the product of careful consideration of documentary evidence, undisputed facts, and trial testimony from (1) National Collegiate Athletic Association (NCAA) President Mark Emmert; (2) Stanford University Athletic Director Bernard Muir; (3) Daniel Rascher, a prominent sports economist and Plaintiffs' expert witness; and (4) Neal Pilson, a former president of CBS Sports and the NCAA's lead expert witness tasked with addressing this very question.

Notably, the panel majority (Bybee, J., and Quist, J. (sitting by designation)) and Chief Judge Thomas were unanimous in affirming liability and half of the remedy. By a 3-0 vote, the Court rejected the NCAA's threshold arguments that it is entitled to blanket antitrust immunity under *NCAA v. Board of Regents of the University of Oklahoma*, 468 U.S. 85 (1984); that the challenged restraint is not commercial; and that the athletes do not suffer injury-in-fact. But, as Chief Judge

Thomas recognized in his separate opinion, the majority's otherwise sound reasoning gave out when it turned to the requirements of the Rule of Reason and improperly second-guessed the District Court's extensive findings that voluntary payments of up to $5,000 present a significantly less restrictive alternative to the current ban on payments for any purpose, from any source. This aspect of the majority's decision creates a rift in this Court's precedent, clashes with Supreme Court authority, sows confusion in antitrust jurisprudence, and involves questions of exceptional importance at the intersection of college athletics and antitrust.

The Court should grant rehearing en banc under Federal Rule of Appellate Procedure 35(a) for four reasons:

(1) As Chief Judge Thomas recognized, "There was sufficient evidence in the record [numerous undisputed facts and the testimony of 'at least four experts'] to support the award" of injunctive relief. ADD64. "It is not appropriate for us on appeal to assess [witness] demeanor we did not see." ADD66. The majority's approach in parsing the evidence anew conflicts with *Anderson v. City of Bessemer City N.C.*, 470 U.S. 564, 573 (1985); *United States v. Lummi Indian Tribe*, 841 F.2d 317, 319 (9th Cir. 1988); and myriad other authorities that describe the deferential standard of review, which considers the possibility of clear error while refraining from substituting the panel's judgment for that of the trial court.

The District Court properly found that small payments would not harm consumer demand, rejecting the NCAA's core contention that the restraint is essential to college sports. That finding was amply supported by testimony from the NCAA's own witnesses as well as evidence of the abandonment of "amateurism" in the Olympics, tennis, and rugby (without adverse consequences); evidence that Pell grants, when combined with some athletic scholarships, already exceed the actual costs of attendance; and evidence that the NCAA and its member schools permit *tennis* players to collect significant cash winnings (up to $10,000 per year before enrollment) without compromising their "amateur" status.

(2) As Chief Judge Thomas also recognized, the majority improperly substituted the NCAA's preferred term—"amateurism," which boils down to the proposition that college athletes must not receive pay (as that term is defined by the NCAA)—in place of the relevant antitrust inquiry: "whether allowing student-athletes to be compensated for their NILs is 'virtually as effective' in preserving *popular demand for college sports* as not allowing compensation." ADD68 (emphasis in original). Chief Judge Thomas pinpointed the legal defect in the majority's reasoning: "Plaintiffs are not required, as the majority suggests, to show that the proposed alternatives are 'virtually as effective' at preserving the concept of amateurism as the NCAA chooses to define it." ADD71. That construction amounts to a tautology, as no alternatives to *amateurism* (the absolute prohibition

3

on pay and the restraint itself) could ever be virtually as effective at preserving *the restraint*. By eliminating or assuming away the core question of consumer demand, the majority created further conflicts with decisions of this Court and of the Supreme Court.

(3) The majority also announced, without citation, a new legal standard for the third step of the Rule of Reason analysis that finds no support in this Court's earlier opinions—*or in any other legal authority*. The parties agreed in their briefing that Plaintiffs' burden under *Tanaka v. University of Southern California*, 252 F.3d 1059 (9th Cir. 2001), was merely to show that any legitimate objectives can be achieved in a substantially less restrictive manner. The majority agreed as much in its recitation of the standard. ADD44. Yet eleven pages later, the majority adopted a new standard that few antitrust plaintiffs could ever satisfy, instructing that its decision "should be taken to establish only that where, as here, a restraint is *patently and inexplicably* stricter than is necessary to accomplish all of its procompetitive objectives, an antitrust court can and should invalidate it and order it replaced with a less restrictive alternative." ADD55 (emphasis in original). That sea change in antitrust jurisprudence is irreconcilable with *Tanaka*, *County of Tuolumne v. Sonora Community Hospital*, 236 F.3d 1148, 1159 (9th Cir. 2001), and *Hairston v. Pacific 10 Conference*, 101 F.3d 1315, 1319 (9th Cir. 1996), and demands this Court's en banc consideration.

(4) Finally, the majority mistakenly resuscitated dicta in *Board of Regents* to guide its review of less restrictive alternatives and the balancing required by the Rule of Reason, which is difficult to square with its earlier rejection of that dicta as affecting antitrust *outcomes*. ADD30 n.10, ADD52. At the outset of its opinion, the majority explained—correctly—that *Board of Regents* merely controls the mode of analysis applicable to antitrust challenges of the NCAA's amateurism rules, not the result. But, having limited the reach of *Board of Regents*, the majority nonetheless returned to the very same dicta later, suggesting that the Supreme Court's comment about the NCAA's "ample latitude" to govern college athletics somehow *elevates* Plaintiffs' burden here in establishing a less restrictive alternative. ADD52. The majority could not explain why that dicta might be a thumb on the scales at this late stage of the antitrust analysis. This unprincipled role for *Board of Regents* is without precedent—and it would single out Plaintiffs here for unique treatment at the Rule of Reason's final step.

## **BACKGROUND**

College athletics is indisputably big business. Division I football and men's basketball command billions of dollars each year, with NCAA executives, conference commissioners, coaches, and athletic directors earning eye-popping salaries. But the athletes—98% of whom will never go pro—cannot receive *any* payments whatsoever, by fiat. NCAA rules prohibit current student-athletes from

receiving compensation, from any source, for, among other things, the use and licensing of their names, images, and likenesses ("NILs") in live game telecasts, videogames, and game re-broadcasts (uses for which professional athletes in the same sports are compensated).

In 2009, Ed O'Bannon sued the NCAA, Collegiate Licensing Company (CLC), and (later) Electronic Arts, Inc. (EA) after seeing an unauthorized depiction of himself—a playable "avatar" with matching physical characteristics and his jersey number—in a NCAA college basketball videogame. O'Bannon and his fellow class representatives alleged that the NCAA, its member schools, and their co-conspirators have agreed to fix at zero the compensation for the commercial use of Plaintiffs' NILs, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Five years of pre-trial proceedings yielded extensive discovery, a $40 million settlement releasing EA and CLC, the District Court's certification of an injunctive class of current and former Football Bowl Subdivision (FBS) football players and Division I men's basketball players, and a partial victory for Plaintiffs at summary judgment.

In June 2014, the District Court held a bench trial that featured 25 witnesses, most of whom were sponsored by the NCAA. Over three weeks, the District Court had ample opportunity to assess the witnesses' credibility and frequently posed questions to witnesses. Following extensive post-trial briefing, the District Court

issued 99 pages of detailed findings of fact and conclusions of law, entered judgment for Plaintiffs, and issued a permanent injunction. ER9-107.

The District Court identified two relevant antitrust markets: (1) the college-education market, in which schools compete to recruit high school athletes by offering bundles of goods and services that include scholarships, facilities, and other incentives; and (2) the group-licensing market, in which college athletes would license their collective NILs on a group basis for use in television media and videogames absent the restraint. Proceeding under the Rule of Reason, the District Court turned to the competitive effects of the restraint. Backed by overwhelming evidence, it found significant anticompetitive effects in the college-education market (but not the group-licensing market) because, absent the restraint, schools would offer compensation for the use of college athletes' NILs that exceeds current scholarship levels and even the true costs of attendance.

The NCAA acknowledged the restraint—its chief economic expert, Daniel Rubinfeld, presented a case study on the NCAA as a "cartel" in his textbook—but countered at trial that the restraint serves procompetitive purposes by preserving "amateurism" (in the form of consumer demand for college sports), maintaining competitive balance among the schools, promoting the integration of education and athletics, and increasing output. The District Court made extensive findings

rejecting nearly all of these proposed procompetitive effects,[1] and on appeal the NCAA abandoned all but "amateurism."

With respect to "amateurism," the District Court found that the NCAA's practices were inconsistent at best—the history of amateurism is fluid—and in any event no evidence supported the NCAA's proposal that its prohibition on pay is essential to college athletics or that small payments to college athletes would reduce the popularity of college sports. In fact, the NCAA's own witnesses acknowledged that consumer demand falls along a continuum—and that modest payments to athletes are consistent with the NCAA's interpretation of "amateurism." Neal Pilson, a former president of CBS Sports, testified that "a million dollars would trouble me and $5000 wouldn't, but that's a pretty good range." SER180. Bernard Muir of Stanford testified that while payments of six or seven figures per athlete would be too high, some lesser sum would not undermine "amateurism." SER365.

Ultimately, the District Court found that the "driving force" behind the popularity of college sports is not any prohibition on pay but rather school loyalty and geography. ER41-42. Nevertheless, crediting NCAA witnesses' testimony, the

---

[1] In addition to its finding of limited procompetitive effects of "amateurism," the Court found that restrictions on *large* amounts of compensation "may" help integrate college athletes into their academic communities. ER47.

District Court found that to the extent that the restraint prevents schools from paying college athletes "*large* sums of money while they are enrolled in school[, it] *may* serve to increase consumer demand for its product." ER98 (emphasis added).

At various junctures, the District Court found the NCAA's evidence "unpersuasive" and "not credible." ER35, 36, 38, 50, 88, 92, 96, 102. But given that the NCAA rules may "yield some limited procompetitive benefits by marginally increasing consumer demand for the NCAA's product and improving the educational services provided to student-athletes," ER103, the Court turned to the existence of substantially less restrictive alternatives—and found two:

> First, the NCAA could permit FBS football and Division I basketball schools to award stipends to student-athletes up to the full cost of attendance, as that term is defined in the NCAA's bylaws, to make up for any shortfall in its grants-in-aid. Second, the NCAA could permit its schools to hold in trust limited and equal shares of its licensing revenue to be distributed to its student-athletes after they leave college or their eligibility expires. The NCAA could also prohibit schools from funding the stipends or payments held in trust with anything other than revenue generated from the use of the student-athletes' own names, images, and likenesses. . . . Neither of these practices would undermine consumer demand for the NCAA's products nor hinder its member schools' efforts to educate student-athletes.

ER100, 103. After entering judgment for Plaintiffs, the District Court permanently enjoined the NCAA from prohibiting its member schools from awarding scholarships up to the full cost of attendance or providing up to $5,000 per year in deferred payments.

**ARGUMENT**

## I. THE MAJORITY'S WHOLESALE RE-EVALUATION OF TRIAL EVIDENCE BREAKS WITH CIRCUIT AND SUPREME COURT PRECEDENT

While paying lip service to the constraints of clear-error review, the majority improperly reevaluated the evidence that voluntary payments of up to $5,000 present a less restrictive alternative. It derided as "threadbare" the testimony of numerous witnesses, among them the NCAA's own industry expert, who confirmed that small payments would not mitigate consumer demand. ADD58. That testimony complemented undisputed evidence, e.g., that the NCAA permits Division I tennis players to earn up to $10,000 in prize money, per year, before enrolling in college—without any concerns about diminished consumer demand for that sport. The majority dismissed this fact, offering only that "[a]llowing college-bound tennis players to accept award money from outside athletic events implicates amateurism differently than allowing schools to pay student-tennis players directly," without citing any support in the record. ADD59 n.21. Elsewhere, the majority had much the same terse response to expert testimony about how fan protests over rising salaries in baseball and the Olympics Committee's inclusion of professional athletes never reduced viewership. [2]

---

[2] The majority also attempted to distinguish Pell grants that raise the total aid package above the cost of attendance by noting that Pell grants, however much they might result in a cash surplus for some athletes, are irrelevant because that

Emblematic of its unbounded evidentiary review, the majority dismissed hours of expert testimony[3] and *speculated* that these sports simply are not "fit analogues" and "[t]he Olympics have not been nearly as transformed by the introduction of professionalism as college sports would be." ADD59. Were that not enough, the majority went to great lengths to excuse the testimony of Neal Pilson—the NCAA's industry expert on "why viewers are interested in college sports on television," a 40-year veteran of college sports, and former president of CBS Sports—who testified that he would not be troubled by payments of $5,000. ER334, SER180. That comment, the majority wrote, was "offhand," "brief," "casual," made under cross-examination (the purpose of which is to elicit the unrehearsed truth), and not one on which Pilson was "prepared" to testify. ADD59-61. This is hardly the language of clear-error review.

As Chief Judge Thomas observed at length in his dissent, the majority's fresh examination supplanted the trier of fact and did not respect the limitations of appellate review. A district court's findings of fact should be upheld absent a definite and firm conviction that a mistake has been committed. *Lentini v. Cal. Ctr.*

---

"compensation [is] intended for education-related expenses." ADD61 n.24. That observation misses the point, however; *intentions* cannot govern consumer demand.

[3] This testimony also included analysis of how consumer demand has not wavered in the face of allegations that college athletes have accepted payments from university officials and boosters.

*for the Arts, Escondido*, 370 F.3d 837, 848-49 (9th Cir. 2004). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson*, 470 U.S. at 565; *see Lummi Indian Tribe*, 841 F.2d at 319. "Where there are two permissible views of the evidence, the factfinder's choice between them *cannot be clearly erroneous*." *Anderson*, 470 U.S. at 574 (emphasis added).

Here, the majority effectively conducted a *de novo* review. And no amount of evidence, it seems, could have convinced the majority "that a rule permitting schools to pay students pure cash compensation and a rule forbidding them from paying NIL compensation are both equally effective in . . . preserving consumer demand." ADD68 n.3. According to the majority, it is a "***self-evident* fact**"[4] that "[t]he difference between offering student-athletes education-related compensation and offering them cash sums untethered to educational expenses is not minor; it is a quantum leap" that will render college athletics less popular and relegate them "to minor league status."[5] ADD61-62 (emphasis added). Though it labeled the

---

[4] The Rule of Reason exists because the competitive effects of most restraints are anything but "self-evident."

[5] NCAA witnesses proposed no such quantum leap. As part of his discredited survey work, NCAA expert Michael Dennis suggested a spectrum of payment amounts and potentially corresponding consumer behavior—but even he disagreed

proposition "self-evident," the majority did not identify any evidence that

payments of $5,000 or less might diminish consumer demand or otherwise threaten

college sports, as Chief Judge Thomas noted. ADD68 n.3. This indifference to the

evidence presented at trial—and disregard for the trial court's vantage to assess

witness credibility—calls out for en banc review.[6]

## II. THE MAJORITY'S RE-FORMULATION OF THE LESS-RESTRICTIVE-ALTERNATIVE INQUIRY IS TAUTOLOGICAL AND AT WAR WITH DECISIONS OF THE SUPREME COURT AND THIS COURT.

As Chief Judge Thomas also noted, the majority's formulation of the less-

restrictive-alternative analysis guaranteed a faulty result by "misstat[ing] our

[legal] inquiry." The preservation of "amateurism," however elusive that term has

proven, is not the concern of antitrust; "[i]n terms of antitrust analysis, the concept

of amateurism is relevant only insofar as it relates to consumer interest." ADD68.

The majority mistakenly inquired whether the *alternative* (of limited revenue-

sharing) is virtually as effective as the status quo at preserving *amateurism* (the

restraint). That construction unmoors the Rule of Reason from competitive effects,

however—the essence of the analysis—and presents a significant legal error that is

---

with the majority's suggestion of an abrupt shift, or quantum leap, in consumer behavior arising from payments of $1. ER36-38, ER53, ER89.

[6] At a minimum, the majority should have remanded this case to the District Court for further fact-finding to consider whether the "self-evident fact" identified by the majority was indeed supported by the record.

13

already attracting attention from antitrust scholars. By removing consumer interest from the framework (or assuming it away), the majority broke from this Court and the Supreme Court. *See, e.g., Bd. of Regents*, 468 U.S. at 119-20 (emphasizing the role of consumer demand in the Rule of Reason analysis); *Nat'l Soc. of Prof'l Engineers v. United States*, 435 U.S. 679, 692 (1978) ("the purpose of the analysis is to form a judgment about the competitive significance of the restraint").

What is more, the majority's conflation of amateurism and consumer interest stems from a misunderstanding of the District Court's findings of *limited* procompetitive benefits produced by the restraint. The majority erroneously treated amateurism as an all-or-nothing proposition—that paying college athletes even a dollar would necessarily dampen enthusiasm among fans because "not paying student-athletes is *precisely what makes them amateurs*" and it is "**self-evident** . . . that paying students for their NIL rights will vitiate their amateur status as collegiate athletes." ADD57-58 (italics in original; bolding added). But that notion, frequently touted by the NCAA, is not borne out by the evidence. As the District Court found, with ample support from the NCAA's own witnesses, consumer interest in college sports is driven almost entirely by school loyalty and geography—and not by the restraint. ER90. Accepting the testimony of numerous NCAA witnesses, however, the District Court found that to the extent that an NCAA rule prohibits *large* payments to college athletes, it "might" have some

limited procompetitive effects in preserving the popularity of college sports. *Id*. The current rules have *no* such effect, however, to the extent they prohibit smaller payments of $5,000 or less, all the more so when held in trust. The majority's unsupported and implausible conclusion that "consumers will flee" if college athletes "earn one dollar above their cost of school attendance" was plainly contradicted by the evidence and is "a difficult argument to swallow." ADD72.

### III. THE MAJORITY'S REQUIREMENT THAT A RESTRAINT MUST BE "*PATENTLY AND INEXPLICABLY* STRICTER THAN IS NECESSARY" TO INCUR LIABILITY UPENDS CIRCUIT PRECEDENT AND NULLIFIES THE RULE OF REASON

The majority decision also warrants rehearing because it upended the Rule of Reason in a single paragraph. Early in its opinion the majority recited *Tanaka*'s familiar formulation that, if a defendant meets its burden of proof at the second step, "[t]he plaintiff must then show that 'any legitimate objectives can be achieved in a substantially less restrictive manner.'" 252 F.3d at 1063. This precise language is echoed in *Hairston*, 101 F.3d at 1319, and *Bhan v. NME Hospitals, Inc*., 929 F.2d 1404, 1413 (9th Cir. 1991), and has guided this Court and lower courts for decades.

Out of nowhere—certainly no party advocated for it—the majority ratcheted up every antitrust plaintiff's burden under the Rule of Reason to a level previously unimaginable. Cautioning any contrary interpretation of its partial affirmance, the majority instructed future courts and litigants that its holding "should be taken to

establish" that where "a restraint is *patently and inexplicably* stricter than is necessary to accomplish all of its procompetitive objectives, an antitrust court can and should invalidate it and order it replaced with a less restrictive alternative." ADD55 (emphasis in original). The majority did not define those italicized terms, but the import is clear: the standard has changed dramatically. Few plaintiffs could convince a court that a restraint is *patently and inexplicably* stricter than necessary, whatever that might mean. And a restraint that fits that towering description would hardly require corroborating testimony, which perhaps explains the majority's continued invocation of purportedly "self-evident" principles. The majority's decision squarely conflicts with settled circuit precedent, and the future of the Rule of Reason in this circuit hangs in the balance.

## IV. *BOARD OF REGENTS* CANNOT GOVERN THE OUTCOME OF THE RULE OF REASON ANALYSIS.

The majority's decision also finds a novel role for *Board of Regents* ("*BoR*") in the Rule of Reason analysis that is inconsistent with its earlier determination that *BoR* cannot affect the *result* of the antitrust analysis. In rejecting the NCAA's proposal that *BoR* immunizes its amateurism rules, the majority reasoned that the Supreme Court's dicta did not consider the merits of the NCAA's rules but merely served to "explain why NCAA rules should be analyzed under the Rule of Reason, rather than held to be illegal per se." ADD29. Even if that language were not dicta, the majority continued, the Supreme Court did not grant an antitrust exemption but

rather flagged the possibility that the NCAA's rules could yield procompetitive benefits. ADD30-31. After all, "[t]he amateurism rules' validity must be proved, not presumed." ADD32. Other circuits have also rejected the NCAA's reading of *BoR* as conferring boundless immunity. *See Smith v. NCAA*, 139 F.3d 180, 186 (3d Cir. 1998), *vacated on other grounds by NCAA v. Smith*, 525 U.S. 459 (1999); *McCormack v. NCAA*, 845 F.2d 1338, 1344–45 (5th Cir. 1988).

Critically, the majority also rejected the NCAA's argument that even if *BoR* yields no absolute immunity, it nevertheless "dictates the *outcome*" of the Rule of Reason analysis. ADD30 n.10. The majority rightly detected "no distinction between that position and an argument for blanket antitrust immunity." *Id*. But a few sections later, *BoR* suddenly re-emerged in the majority's opinion, without explanation, as somehow transforming the less-restrictive-alternative inquiry. Building again on *Tanaka*, the majority fashioned another unique burden on Plaintiffs here, couched in the language of a "strong evidentiary showing" and purportedly arising from the Supreme Court's comment "that we must generally afford the NCAA 'ample latitude' to superintend college athletics." ADD52-53. But this new function is at war with the majority's earlier explanation that the only "latitude" due the NCAA is garden-variety Rule of Reason analysis and balancing.

Again, *BoR* cannot override this framework by influencing *outcomes*.[7] Yet the majority misapplied *BoR* to do just that, ultimately weighing the "evidence in the record" against the "Supreme Court's admonition" before holding that the Rule of Reason merely "requires that the NCAA permit its schools to provide up to the cost of attendance to their student athletes. It does not require more." ADD63.

This is an unprecedented role for the Supreme Court's dicta, fashioned from thin air. And it is particularly worrisome because it enables *BoR* to "dictate the outcome"—notwithstanding the majority's earlier holding—of an antitrust challenge where the evidence of less restrictive alternatives might be sufficient in any other context. Even here, where the evidence supporting the less restrictive alternative of modest voluntary payments is abundant, the majority employed *BoR* to strike out the District Court's finding. *Id*. This is immunity in another guise— for conduct that would be per se price fixing in any other industry.

## CONCLUSION

For these reasons, the Court should grant rehearing en banc.

---

[7] The majority also sidestepped *BoR*'s guidance that "good motives will not validate an otherwise anticompetitive practice." 468 U.S. at 101 n.23.

Respectfully submitted,

Michael P. Lehmann
Bonny Sweeney
Bruce Wecker
HAUSFELD LLP
600 Montgomery St., Ste. 3200
San Francisco, CA 94111
Telephone: (415) 633-1908

*/s/ Michael D. Hausfeld*
Michael D. Hausfeld
Hilary K. Scherrer
Sathya S. Gosselin
Swathi Bojedla
HAUSFELD LLP
1700 K St. NW, Ste. 650
Washington, DC 20006
Telephone:  (202) 540-7200

Jonathan Massey
MASSEY & GAIL LLP
1325 G St. NW, Ste. 500
Washington, DC 20005
Telephone: (202) 652-4511

*Counsel for Plaintiffs-Appellees*

Dated:  October 14, 2015

**CERTIFICATE OF COMPLIANCE**

I certify pursuant to Circuit Rule 35-4 that the attached petition for rehearing en banc is proportionately spaced, has a typeface of 14 points or more, and contains 4,184 words.

/s/ *Michael D. Hausfeld*_____

**CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on October 14, 2015. Counsel for all parties to the case are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/_Michael D. Hausfeld_____